UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Joan Frost,
     Plaintiff

     v.                                   Civil No. 09-cv-120-SM
                                                  Opinion No. 2010 DNH 017
Hartford Life and Accident
Insurance Company,
     Defendant

**O R D E R**

Plaintiff, Joan Frost, brings suit under the civil
enforcement provisions of the Employee Retirement Income Security
Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B).  She claims that her
long-term disability benefits, which she had been receiving under
an employee welfare benefit plan sponsored by her employer (the
"Plan"), were wrongfully terminated.  Defendant, Hartford Life
and Accident Insurance Company ("Hartford"), underwrites the Plan
and also acts as the Plan administrator.

Pending before the court are the parties' cross-motions for
judgment on the administrative record.  Based upon that record,
the court is constrained to conclude that, because judicial
review of Hartford's decision to terminate Frost's long-term
disability benefits is deferential, and because that decision
cannot be said to have been "arbitrary and capricious," Hartford
is entitled to judgment as a matter of law.

**Factual Background**

Pursuant to this court's Local Rule 9.4(b), the parties have submitted a Joint Statement of Material Facts which, because it is part of the court's record (document no. 11), need not be recounted in this opinion.  In brief, the relevant facts are as follows.


I.    The Plan.

The Plan provides coverage for both "total disability" and "partial disability."  Frost had been receiving benefits for the former, which is defined as follows:

> **Total Disability or Totally Disabled** means that:
>
> (1)  during the Elimination Period; and
>
> (2)  for the next 12 months, [the employee is] prevented by:
>
>> (a)  accidental bodily injury;
>>
>> (b)  sickness;
>>
>> (c)  Mental Illness;
>>
>> (d)  substance abuse; or
>>
>> (e)  pregnancy,
>
> from performing the essential duties of [her] occupation, and [is] under the continuous care of a Physician and as a result [she is] <u>earning less than 20% of [her] Pre-disability Earnings</u>, unless engaged in a program of Rehabilitative Employment approved by [Hartford].
>
> After that, [the employee] must be so prevented from performing the essential duties of <u>any occupation</u> for

which [she is] qualified by education, training or
experience.

Admin. Rec. at 957 (emphasis supplied).  Immediately prior to her

disability, Frost had been earning $2,091.27 per month.  Admin.

Rec. at 37.  So, to be totally disabled under the terms of the

Plan, Frost must, among other things, be earning less than

$418.25 per month (i.e., twenty percent of $ 2,091.27).  Or,

stated slightly differently, if Frost is capable of earning more

than $418.25 per month, despite disability due to a listed

condition, she is not "Totally Disabled" under the Plan.


II.  <u>Plaintiff's Disability Claim</u>.

     Ms. Frost worked for Wal-Mart Stores, Inc., at one of the

company's Sam's Club membership warehouses, as a maintenance

supervisor.  After being diagnosed with cardiomyopathy

(apparently caused by a viral infection), superimposed upon a

pre-existing diagnosis of fibromyalgia, Frost was no longer able

to work.  She applied for, and was granted, short-term disability

benefits.  She also applied for, and was granted, Social Security

disability benefits.  Admin. Rec. at 905.


     Subsequently, Frost applied for long-term disability

benefits under the Plan.  As Plan Administrator, Hartford

reviewed her claim, concluded she met the Plan's definition of

3

total disability, and granted her request for benefits, effective September 10, 2001.  Frost's long-term disability benefits were continued beyond September 10, 2002 (i.e., the one-year anniversary of her award of benefits), after Hartford determined that she was not only unable to perform the essential duties of her own job as a maintenance supervisor, but that she was also unable to perform "the essential duties of any occupation for which [she was] qualified by education, training or experience." Admin. Rec. at 957.

In October of 2003, Frost underwent surgery to have a cardiac pacemaker implanted.  Between 2003 and 2007, Hartford periodically obtained statements from both Frost and her treating physicians concerning her medical conditions and her ability to return to the workforce.  Each time, Hartford concluded that she remained totally disabled, as defined in the Plan, and continued her long-term disability payments.

In the fall of 2006, Frost completed a "Personal Profile Evaluation" and reported that she "can't stand, or walk, or sit, or lift because of [her] heart condition and fibromyalgia." Admin. Rec. at 654.  In the summer of 2007, Hartford began a more thorough review of Frost's file and retained a private investigator to watch Frost and to report on her activities of

4

daily living.  Observations made by the investigator were
inconsistent with Frost's claims, as she appeared able to enter
and exit her car, stand, sit, bend over, and walk without
difficulty.  Those observations were summarized as follows:

> The claimant asserts she cannot stand, walk, sit or
> lift because of her heart condition and fibromyalgia.
> Her doctor states all activities are limited by dysphea
> [i.e., shortness of breath], pain and fatigue.
> Conversely, the activity checks showed the subject
> active during two of the three days.  She was observed
> standing, walking, sitting, driving and using her hands
> in an unrestricted fashion.  The subject also frequents
> a social club, but her activities while inside are
> unknown.

> A face-to-face interview was conducted by Hartford
> Investigator James Fitzgerald on 10/24/07.  I/A notes
> the following inconsistencies:

> The claimant admitted to playing badminton with her
> niece and nephew last summer.

> The claimant states she performs a daily home exercise
> program for 10-15 minutes, including lifting a bar to
> strengthen her arms and body.  She also states she
> walks outside or at a mall for 30 minutes twice weekly.

> The claimant states she can walk a maximum of 1/4 mile
> and it takes her 45-60 minutes.  This is a very slow
> pace of one [sic] mile per hour.  During the activity
> checks, the claimant walked with a normal gait at a
> normal pace.

> The claimant states she can stand a maximum of 10-15
> minutes.  During the activity check, she was seen
> standing for over 20 minutes.

> The claimant states that bending to collect something
> from the floor causes her pain to increase to a 5-6/10.
> During the activity check she dropped a cigarette, bent
> over to collect it, then stood with no noticeable pain
> symptoms.

The claimant states she can squat, but would need
assistance from someone [or] something to rise to a
standing position.  During the activity check, she was
seen sitting on a bottom step near the ground, then
standing without assistance from a person or even using
the hand-rail right beside her.

The claimant states she cannot keep her balance.
During the activity check, no balance problems were
observed.

The claimant states she has difficulty entering and
exiting a vehicle.  During the activity check, she was
seen entering and exiting her vehicle on several
occasions without difficulty.

Admin. Rec. at 56.  That summary accurately describes Frost's

activities during the three days she was observed.  See Admin.

Rec. at 1013-14 (copies of surveillance videos).  It seemed,

then, that when speaking with her treating physician, Frost had

exaggerated, at least to some degree, the extent and disabling

nature of her pain.  See, e.g., Admin. Rec. at 172-75 (Frost's

claimed limitations, as reported by her primary care physician,

Dr. Brian Claussen).


So, in the fall of 2007, Hartford requested Frost's medical

records from Dr. Claussen, as well as Dr. Lavery (her

cardiologist).  In their joint statement of material facts, the

parties summarized Dr. Lavery's records as follows:

04/27/2006 - Letter from Dr. Lavery to Dr. Claussen.
Patient has had more fatigue.  She has been less active
because of the winter and because of a fracture to her
foot.  She is not having any worsening dyspnea.  She

6

had an echo in January that showed an ejection fraction
of 45-50% which is markedly improved.  AR at 00647.

09/19/2006 - Letter from Dr. Lavery to Dr. Claussen.
Patient has been limited mostly by her fibromyalgia.
There was a time when she has had to walk with a cane.
She is not having any major symptoms of dyspnea.  She
had pacemaker checked on 8/29/06 and it was good.  To
f/u in January to repeat echo.  If that shows normal to
minimally decreased LV function, will probably stop her
digoxin and will begin to reduce her diuretics.  AR at
00646.

01/05/2007 - Letter from Dr. Lavery to Dr. Claussen.
Patient seen for mild fatigue and musculoskeletal
issues, but in general feels fairly well.  Had her
pacemaker checked on 12/19/06 with good RV and LV
thresholds and is 100% atrial sensed ventricular paced.
She has normal chamber dimensions and good function
with a normal ejection function.  At this point do not
see any continued indication for Coumadin.  Will f/u in
4 months and possibly get her off diuretics.  AR at
00645.

01/05/2007 - Echocardiogram - Normal left ventricular
size, good systolic function, normal wall motion and
ejection fraction 55-60% Wall thickness is normal.
Flow patterns across the mitral valve are compatible
with impaired LV relaxation.  Compared to echo of
January 2006, there has been further improvement in
ejection fraction.  AR at 00651.

03/22/2007 - History and Physical from Elliot Hospital.
Patient is admitted with chest pain.  Basically, she
has chronic chest pain with fibromyalgia and a
cardiomyopathy.  These pains come and go though not
terribly frequently.  Chest x-ray basically
unremarkable.  She has hyperlipidemia, depression,
hypertension, chronic obstructive pulmonary disease,
and cigarette abuse.  Patient admitted to rule out
myocardial infarction.  AR at 00641-00642.

03/23/2007 - Discharge Summary from Elliot Hospital.
Discharge diagnoses: Atypical chest pain,
cardiomyopathy, fibromyalgia, hyperlipidemea.  Patient
to follow-up with Dr. Claussen about further
adjustments in her Lipitor dose or consideration for
adding Zetia to further lower her LDL. She will resume

her previous diet.  She will gradually resume previous
levels of activity.  AR at 00643-00644.

05/07/2007 - Letter from Dr. Lavery to Dr. Claussen.
Patient was hospitalized at the Elliot in May with
atypical chest pain somewhat hypokalemic resulting in
an increase in her potassium.  She was also found to be
significantly hyperlipidemic and has recently added
Zetia to her Lipitor.  She feels well, is now walking 5
miles a day.  She is no longer having any chest
discomfort, and while she is still dyspneic she is able
to complete her walk.  Her pacemaker check is in order.
AR at 00640.

Joint Statement of Material Facts at 15-16.  The parties

summarized Dr. Claussen's records as follows:

09/27/2006 - Office note from Dr. Claussen. Patient
seen for chronic f/u visit regarding cardiomyopathy,
COPD, and fibromyalgia.  She saw Dr. Thies for the
first time in several years for f/u of chronic pain
issues related to fibromyalgia.  Dr. Thies stated that
everything was okay and he would make no changes in her
medications according to the patient.  Patient recently
saw Dr. Lavery for her cardiomyopathy.  He scheduled
her for an echo in January and told her he may be
stream lining her medication.  Was started on a course
of Protonix for symptoms of abdominal pain felt to be
due to possibly gastritis or gastroesophageal reflux.
She complains today of frequent headaches associated
with photophobia, phonophobia and some nausea.  AR at
00636-00637.

11/13/2006 - Office note from Dr. Claussen.  Seen today
for chronic f/u. She complains of frequent headaches.
She states she gets a headache 2-3 days a week.  She
recently saw Dr. Thies for her fibromyalgia and chronic
musculoskeletal pains.  No medications changes were
made.  She denies any chest pain, shortness of breath,
cough, sore throat.  AR at 00633-00634.

12/19/2006 - Office note from Dr. Claussen.  Patient is
seen regarding her CHF and some other issues.  She
complains of 4-6 week history of nasal congestion.  She
continues to complain of abdominal bloating.  She feels

as though her pants do not fit her well.  The bloating
has not changed and has not responded to OTC medicines.
She states her abdomen feels like a balloon shortly
after eating.  This feeling does resolve over time but
recurs with each meal.  Will try Zelnorm.  AR at 00630-
00631.

01/31/2007 - Office note from Dr. Claussen. F/U
multiple issues.  Her cardiologist did a recent echo
and noted her normal cardiac function.  She was started
on Zelnorm at last visit for abdominal bloating and
constipation – seemed to help.  She is bothered today
by a rash on her left buttock that has been present for
several weeks. She is wondering if she might have
psoriasis.  Assessment: Cardiomyopathy – encouraged
that patient has been taken off some of her higher
strength cardiac meds.  No longer on anticoagulation.
Switched to low dose aspirin.  AR at 00628-00629.

04/02/2007 - Office note from Dr. Claussen.  F/U visit.
Patient seen for number of reasons.  She was
hospitalized at Elliot Hospital last week for atypical
chest pain.  Her cardiologist thought that her atypical
chest pain was likely anxiety-related.  She has been
under a lot of stress lately.  She has difficulty
sleeping, particularly difficulty falling asleep.
Negative for GI or GU problems.  She denies dyspnea or
chest pain on exertion.  Assessment: Atypical chest
pain, depression/dysthymia, hyperlipidemia, dry nose,
fibromyalgia, COPD.  AR at 00626-00627.

04/30/2007 - Office note from Dr. Claussen. F/U
depression.  Patient was changed from Zoloft to
Citalopram at her lest visit on April 2nd.  Thus far,
she has tolerated the Citalopram well and states it is
helping.  She states she is sleeping better and her
moods are better.  Over the last year she has been
taken off of Lasix, Digoxin and Coumadin.  An echo in
January showed normal ejection fraction between 55 and
60%.  AR at 00624-00625.[1]

07/06/2007 - Office note from Dr. Claussen. F/U
multiple issues.  She saw her cardiologist in the
Spring and underwent a stress test back in March.  She

---

[1]     The record suggests that an ejection fraction of 50% or
better is considered normal.

took Zetia for a few months and saw a nice drop in her
cholesterol levels on lab work in May.  She complains
of urinary frequency and burning for about the last
week.  A UA done in the office today shows trace
leukocytes and trace blood.  Assessment –
Cardiomyopathy – improving systolic function with
medical therapy.  It appears she is still on the
diuretic and potassium supplement and wishes to
continue.  AR at 00622.

08/20/2007 - Office note from Dr. Claussen.  F/U visit.
Patient complains of discomfort in her lower back,
pelvis, groin and hips. She had called 4 weeks ago
requesting an anti-inflammatory drug.  She continues to
complain of a burning sensation in her groin and vulvar
area.  COPD – appears stable.  Vulvar/perineal pain
with burning – suspicion of lichen sclerosis.  AR at
00620-00621.

10/16/2007 - Office note from Dr. Claussen. F/U
multiple issues.  She states her breathing is generally
not too bothersome.  She complains of symptoms of
frequent heartburn.  In the last week, she has woken up
from sleep once or twice.  She has also had heartburn
on waking in the morning a few times.  She admits to
some increased stress of late.  Her ex-boyfriend/
roommate suffers from alcoholism which has been quite a
strain on their relationship.  Assessment: Anxiety,
hypertriglyceridemia.  AR at 00619.

11/19/2007 – Office note from Dr. Claussen.  Sinus
issue.  AR at 00618.


Joint Statement of Material Facts at 16-17.


    In January of 2008, Frost's medical records were reviewed by

Connie Behrle, one of Hartford's in-house nurse consultants, who

concluded that: (1) Frost's primary diagnosis was no longer

cardiomyopathy; (2) her primary diagnosis was now fibromyalgia,

though she was receiving treatment from her primary care

physician and had not been referred to a rheumatologist or had additional testing to rule out any other diagnosis that might be the source of her pain; and (3) the level of functioning Frost described in her interview and as shown on the surveillance videos "would seem comparable to a sedentary or light work capacity." Admin. Rec. at 54.

In February of 2008, Dr. Claussen again opined that Frost was incapable of performing light or sedentary work on a full-time basis. Admin. Rec. at 570-71. Nevertheless, based upon the report from Hartford's in-house nurse, as well as the office notes from both of Frost's treating physicians, Dr. Claussen and Dr. Lavery, Hartford could have plausibly concluded that: (1) since she was first deemed to be totally disabled approximately six years earlier, Frost's ejection fraction had "markedly improved" and she was demonstrating "normal ejection function"; (2) by May of 2007, she was feeling well and walking up to 5 miles a day; (3) her pacemaker was functioning normally; (4) an echocardiogram revealed that she had normal cardiac function; (5) as her condition improved, her cardiac medications had been significantly reduced; (6) she no longer complained of shortness of breath, though she did continue to suffer from mild fatigue and periodic sleep disturbances; and (7) her ability to engage in moderate physical activities (as she herself reported and as

11

shown on the videos) strongly suggested that, at a minimum, she was no longer as incapacitated by her illnesses as she had been when she first began receiving disability benefits.

In March of 2008, Hartford submitted Ms. Frost's medical records to two independent physicians to obtain their professional opinions as to whether Frost's conditions - primarily the cardiomyopathy and fibromyalgia - had improved sufficiently to permit her to return to work.  Dr. Dayton Dennis Payne, a board certified rheumatologist, opined that, "Following a careful and thorough review of the medical record data presented, there are no findings from a rheumatology viewpoint that would be expected to be producing restrictions or limitations on [Ms. Frost's] activities."  Admin. Rec. at 554. And, Dr. Mark Friedman, a board certified cardiologist, observed that:

> The diagnosis of a non ischemic cardiomyopathy with
> improved LV systolic function with medical therapy and
> biventricular pacing would not preclude a return to
> work.  The claimant's cardiac function has returned to
> normal as measured by the Adenosine Nuclear Stress Test
> in 05/2007 demonstrating a LV ejection fraction of 57
> percent and an echocardiogram from 01/2007
> demonstrating  LV ejection fraction of 55 to 60
> percent.  Although the claimant would need to continue
> on her medical therapy and continue to use her
> pacemaker the claimant would not be limited to a degree
> that would preclude her return to work.  The claimant
> would have some limitations and restrictions related to
> her cardiac status (listed below), however these

limitations and restrictions would not preclude the
claimant from returning to work.

Admin. Rec. at 556.  Ultimately, Dr. Friedman concluded that:

> The claimant has a history of nonischemic
> cardiomyopathy that was diagnosed in 2001.  At that
> time the claimant had evidence for severe LV systolic
> dysfunction and NYHA Class III heart failure.  With
> appropriate medical therapy and with implantation of a
> biventricular pacemaker the claimant had marked
> improvement of her LV function so that by 01/2007 the
> claimant had a normal LV ejection fraction of 55 to 60
> percent.  In 05/2007, the claimant was reported to be
> walking five miles per day and on the surveillance DVD
> from 07/2007 and 08/2007, the claimant was observed to
> be acting normally, with no obvious distress, with
> normal levels of physical activity.  From a cardiac
> perspective, the claimant has had marked improvement in
> her functional capacity and the claimant would be
> capable of returning to full time work with the
> limitations and restrictions noted above.

Id. at 557-58.


     Subsequently, in March of 2008, an employee of Hartford

completed an "employability analysis" and concluded that Frost

was capable of performing at least ten sedentary and light

occupations, each of which would provide her with more than

enough income to exclude her from the Plan's definition of total

disability.  Admin. Rec. at 547-49.  See also Admin. Rec. at 45-

47.  The following week, Hartford notified Frost that it had

determined that she no longer met the Plan's definition of

disabled and, therefore, it was terminating her long-term

disability benefits, effective April 1, 2008.  Admin. Rec. at

542-46.  Frost appealed that determination.  Admin. Rec. at 511.

See also Admin. Rec. at 169-71.  In response, Hartford asked her

to submit to an independent medical evaluation.  She agreed and,

on October 14, 2008, she met with Dr. Barbara O'Dea.


      In addition to giving Frost a physical examination and

taking her medical history, Dr. O'Dea also reviewed Frost's

medical records dating back to January of 2001, including the

reports prepared by the two independent reviewing physicians.

Dr. O'Dea prepared a lengthy and detailed report, which she

submitted to Hartford.  Admin. Rec. 119-27.  After discussing

Frost's medical history and the improvement in her condition as a

result of the pacemaker and medical treatment, Dr. O'Dea

concluded that:

> There is no doubt that patient was significantly
> disabled with the cardiomyopathy initially with her
> thrombus formation and congestive heart failure.
> However, by 2007, her cardiac function with therapy and
> the pacer had returned to normal.  She does have
> permanent limitations as described by cardiologist
> reviewer based on her past history of this and her
> continued need for pacemaker.  Any further limitations
> that she has currently are not based on cardiac issues.
>
> Patient has COPD likely mild to moderate amount that
> does not preclude sedentary to light activities.  Her
> complaint of irritable bowel syndrome is not
> functionally limiting.
>
> Therefore, patient's main diagnosis potentially
> affecting return to work is her fibromyalgia, anxiety

14

and depression.  The rheumatology opinion was that
there was no evidence of inflammatory or degenerative
arthritis.  He found no limitations were needed based
on rheumatological viewpoint.  Regardless of whether a
patient should be considered disabled due to subjective
pain, the subjective presence of pain leads to self
limiting behavior which leads to deconditioning.  This
deconditioning can be a more objective source of
physical limitation.  This appears to be the situation
in this patient's case.  <u>However, deconditioning does
not preclude sedentary to light activities for this
patient, at least part time, as evidenced by her exam
today, by her own description of her daily activities,
and by the surveillance videos</u>.  The effect of her
anxiety and depression on her attention ability for
detailed work is beyond the scope of this exam.

<u>She is currently capable of return to sedentary work,
part time 4 hours a day</u>.  She should have the ability
to stand or sit when needed for comfort.  She should
avoid lifting greater than 10 pounds.  She should avoid
lifting over shoulder height.  She should not do jobs
requiring balance or heavy machinery.  She should avoid
pushing or pulling.  She has no restrictions on fine
motor activities.  She should return to her walking
exercise and light lifting and stretching exercises.

Admin. Rec. at 127 (emphasis supplied).

By letter dated October 28, 2008, Hartford notified Frost of
its decision to uphold its earlier termination of her long-term
disability benefits, concluding that:

In summary, our appeal review concludes the weight of
the information in the claim file viewed as a whole
supports that Ms. Frost is medically capable of
performing sedentary and light work <u>at least on a part
time basis</u>.

. . . Taking into consideration Dr. O'Dea's restriction
that <u>Ms. Frost may work 4 hours a day</u>, the occupations

> listed in the employability analysis <u>would meet the
> required earning potential at 4 hours per day</u>.
>
> Because Ms. Frost is medically capable of part time
> sedentary and light work and vocationally employable
> within her work restrictions, she is not disabled and
> the decision to terminate her LTD benefit payments is
> correct under the terms of the policy.

Admin. Rec. at 117 (emphasis supplied).  This suit followed.


### Standard of Review

I.   <u>Generally</u>.

Cases brought under ERISA require the district court to
employ a somewhat modified version of the standard of review
typically applied to motions for summary judgment.  Rather than
take evidence or consider affidavits and deposition testimony,
the court "evaluates the reasonableness of an administrative
determination in light of the record compiled before the plan
fiduciary."  <u>Leahy v. Raytheon Co.</u>, 315 F.3d 11, 18 (1st Cir.
2002).  Consequently, this court sits more as an "appellate
tribunal than as a trial court" in determining whether a plan
administrator's benefits eligibility decision is sustainable.
<u>Id</u>.  This means that "summary judgment is simply a vehicle for
deciding the issue," and "the non-moving party is not entitled to
the usual inferences in its favor."  <u>Orndorf v. Paul Revere Life
Ins. Co.</u>, 404 F.3d 510, 517 (1st Cir. 2005) (citation omitted).

16

Here, Frost acknowledges that, under the terms of the Plan,
"Hartford has full discretion and authority to determine
eligibility for benefits and to construe and interpret all terms
and provisions of the Group Insurance Policy."  Complaint, at
para. 7 (quoting the Plan).  See also, Admin. Rec. at 957.  She
also acknowledges that this court's review of Hartford's decision
to terminate her long-term disability benefits is governed by the
deferential "arbitrary and capricious" standard of review.
Plaintiff's Memorandum (document no. 15-2) at 6.  See generally
Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).


Under the arbitrary and capricious standard of review, this
court must uphold a plan administrator's benefits eligibility
determination if its decision was reasoned and supported by
substantial evidence.  As the court of appeals has noted:

> When, as in this case, a plan administrator has
> discretion to determine an applicant's eligibility for
> and entitlement to benefits, the administrator's
> decision must be upheld unless it is "arbitrary,
> capricious, or an abuse of discretion."  In other
> words, the administrator's decision must be upheld if
> it is reasoned and supported by substantial evidence.
> Evidence is substantial if it is reasonably sufficient
> to support a conclusion, and the existence of contrary
> evidence does not, in itself, make the administrator's
> decision arbitrary.

Gannon v. Metro. Life Ins. Co., 360 F.3d 211, 212-13 (1st Cir.
2004) (footnote and citations omitted).  See also Doyle v. Paul

17

Revere Life Ins. Co., 144 F.3d 181, 184 (1st Cir. 1998)
("Substantial evidence . . . means evidence reasonably sufficient
to support a conclusion.  Sufficiency, of course, does not
disappear merely by reason of contradictory evidence.").

     Necessarily, then, whether the court would award benefits to
Frost under the Plan is immaterial.  See, e.g., Brigham v. Sun
Life of Canada, 317 F.3d 72, 85 (1st Cir. 2003) ("The question we
face in this appeal is not which side we believe is right, but
whether [the defendant] had substantial evidentiary grounds for a
reasonable decision in its favor.") (citation and internal
punctuation omitted).  The sole issue presented is whether there
is "reasonably sufficient" evidence in the record to support
Hartford's denial of benefits.

II.  Conflicts of Interest.

     In those cases where the plan administrator also funds the
plan's obligations out of its own resources (such as when an
insurance company underwrites the plan and also determines when
and to whom benefits are payable), there exists an obvious
conflict of interest.  And, for years, courts have wrestled with
how (and to what degree) they should weigh that conflict in
deciding whether a benefits eligibility determination was
"arbitrary and capricious."  See, e.g., Thompson v. Liberty Life

18

Assur. Co., 2007 DNH 119 at 4-5 (D.N.H. Sept. 24, 2007) ("To be
sure, numerous courts, including this one, have questioned the
propriety, and even fairness, of the 'arbitrary and capricious'
standard of review in cases where the same entity that makes
eligibility determinations also funds benefit payments.").  The
Supreme Court recently addressed just that issue.  Metro. Life
Ins. Co. v. Glenn, 128 S. Ct. 2343 (2008).

     In Glenn, the Court specifically held that even in cases
involving conflicts of interest, the governing standard of review
remains "arbitrary and capricious."  But, courts should take into
account the existence of such conflicts when evaluating the many
case-specific factors involved in benefits eligibility disputes.

> In such instances, any one factor will act as a
> tiebreaker when the other factors are closely balanced,
> the degree of closeness necessarily depending upon the
> tie-breaking factor's inherent or case-specific
> importance.  The conflict of interest at issue here,
> for example, should prove more important (perhaps of
> great importance) where circumstances suggest a higher
> likelihood that it affected the benefits decision,
> including, but not limited to, cases where an insurance
> company administrator has a history of biased claims
> administration.  It should prove less important
> (perhaps to the vanishing point) where the
> administrator has taken active steps to reduce
> potential bias and to promote accuracy, for example, by
> walling off claims administrators from those interested
> in firm finances, or by imposing management checks that

> penalize inaccurate decisionmaking irrespective of whom
> the inaccuracy benefits.

Id. at 2351 (citations omitted).  Citing that language, the court

of appeals for this circuit recently held that district courts

"are duty-bound to inquire into what steps a plan administrator

has taken to insulate the decisionmaking process against the

potentially pernicious effects of structural conflicts."  Denmark

v. Liberty Life Assur. Co., 566 F.3d 1, 9 (1st Cir. 2009).  In

Denmark, however, the court of appeals recognized that there may

be cases in which the plan administrator's benefits eligibility

determination is so plainly supported by the record that even the

presence of an actual conflict of interest will not compel

reversal of that decision.  Id.


With those principles in mind, the court turns to the

parties' pending motions.


## Discussion

I.   Weight to be Ascribed to the Structural Conflict.

Frost argues that Hartford's "conflict of interest is

significant in this case," and says the "facts and circumstances

of this case are more compelling [than those] in [Glenn]."

Plaintiff's memorandum at 7.  The court disagrees.

Plainly, this case involves a "structural conflict" - that is, Hartford not only determines eligibility for disability benefits, but it also funds those disability benefits. Consequently, Hartford has an obvious financial incentive to deny claims for benefits under the Plan.  But, Frost has not pointed to any evidence suggesting that Hartford's benefits eligibility determination was infected by a financial desire to minimize the outlay of corporate funds.  Nor has she suggested that Hartford "has a history of biased claims administration," <u>Glenn</u>, 128 S. Ct. at 2351, or that it acted in an "offhand [manner when] discounting contrary medical opinions," <u>Denmark</u>, 566 F.3d at 8.

Instead, the record evidence suggests that Hartford's decisions were not influenced by financial concerns and were, instead, based solely on Frost's medical records and the videos showing her physical abilities (at least on the days she was observed).  For example, Hartford reviewed and <u>granted</u> Frost's initial request for long-term disability benefits, concluding that she could not perform the essential functions of her occupation.  It then extended those benefits (and continued paying them for more than six and one-half years), after repeatedly concluding that she was precluded from performing any occupation for which she was qualified by education, training, or experience.

Additionally, prior to terminating Frost's benefits, Hartford reviewed the treatment notes taken by both her primary care physician and her cardiologist, which revealed that her condition had substantially improved; reviewed the surveillance tapes which plainly demonstrated various activities in which Frost was able to engage; referred Frost's case out to two independent, board certified, physicians for their opinions on any medically-related limitations she might have which would preclude gainful employment; conducted an "employability analysis" to determine if there are jobs in the national economy which she might perform, in light of her limitations; and, referred the matter to a third independent physician, who took Frost's medical history, performed a physical examination, and reviewed all of Frost's medical records.

Hartford's structural conflict, arising from its role as both Plan administrator and the entity responsible for funding the Plan's obligations, is one of many factors the court must consider in resolving this case.  But, given the record evidence, it is not a factor entitled to substantial weight, and cannot tip the balance in plaintiff's favor.

II.  <u>Hartford's Decision to Terminate Benefits</u>.

     The record, when considered as a whole, is more than

sufficient to support Hartford's conclusion that: (1) since the

date on which she became disabled, Frost's condition has improved

substantially; and (2) as of April 1, 2008, Frost was, at the

very least, capable of part-time sedentary work, as described by

Dr. O'Dea.  Given Dr. O'Dea's conclusions, as supported by the

medical opinions of Dr. Payne and Dr. Friedman, Hartford's

determination that Frost no longer met the Plan's definition of

total disability cannot be said to have been arbitrary,

capricious, or an abuse of discretion.  Hartford's decision is,

in other words, supported by substantial evidence.


     To be sure, there is evidence in the record supportive of

Frost's claim that she is, in fact, totally disabled (e.g., Dr.

Claussen's opinion, given in February of 2008, that she remains

incapable of full-time work, Admin. Rec. at 571, and the fact

that she continues to receive Social Security disability

benefits).  But, as noted above, a decision can be supported by

substantial evidence even when there is substantial evidence to

support the opposite conclusion.  <u>Gannon</u>, 360 F.3d at 212-13.

<u>See also Doyle</u>, 144 F.3d at 184 ("Substantial evidence . . .

means evidence reasonably sufficient to support a conclusion.

Sufficiency, of course, does not disappear merely by reason of

contradictory evidence.").  As the Supreme Court has noted,
substantial evidence is something less than the weight of the
evidence, and the possibility of drawing two inconsistent
conclusions from the evidence does not prevent a decision from
being supported by substantial evidence.  <u>Consolo v. Federal
Maritime Comm'n.</u>, 383 U.S. 607, 620 (1966).

So it is in this case.  Despite evidence supportive of
Frost's claim that she remains totally disabled, there is
substantial evidence in the record supportive of Hartford's
conclusion that she is not.  The progress notes from both Dr.
Lavery (Frost's cardiologist) and Dr. Claussen (Frost's PCP), the
observations of Nurse Behrle, the surveillance videos, the
opinions of both Dr. Payne (independent Rheumatologist) and Dr.
Friedman (independent cardiologist), and the opinion issued by
the examining independent medical expert, Dr. O'Dea, all support
Hartford's adverse disability determination.

Parenthetically, the court notes that, contrary to Frost's
suggestion, Hartford was not required to give controlling weight
to her treating physician's opinion that she remains totally
disabled.  <u>See, e.g.</u>, <u>Black & Decker Disability Plan v. Nord</u>, 538
U.S. 822, 831 (2003) (refusing to adopt the "treating physician
rule" in ERISA cases, despite its application in Social Security

24

disability benefits cases, and noting that "[n]othing in [ERISA] itself suggests that plan administrators must accord special deference to the opinions of treating physicians.  Nor does the Act impose a heightened burden of explanation on administrators when they reject a treating physician's opinion.").  <u>See also</u> <u>Tsoulas v. Liberty Life Assur. Co.</u>, 454 F.3d 69, 77 (1st Cir. 2006).

Nor was Hartford obligated to adopt Dr. O'Dea's conclusion that Frost was capable of only part-time <u>sedentary</u> employment. Given the thorough and well-reasoned opinions of Dr. Payne and Dr. Friedman, Hartford could have sustainably concluded that Frost was capable of light work, on either a part-time or full-time basis.  That point is, however, largely an academic one.  In both its original and final letters to Frost notifying her of the decision to terminate long-term disability benefits, Hartford relied on Frost's ability to perform the essential functions of at least ten specifically-identified occupations.  Of those ten occupations, nine are characterized by the Dictionary of Occupational Titles as requiring work at the sedentary level; only one (Gate Guard, DOT 372.667-030) is listed as requiring work at the light level.  <u>See</u> Admin. Rec. at 520.[2]

_____

[2]    The ten occupations specifically identified in Hartford's "employability analysis" are representative of the 412 occupations Hartford concluded Frost could actually perform.  Of

25

Moreover, for purposes of determining Frost's eligibility for long-term disability benefits, Hartford <u>accepted</u> Dr. O'Dea's opinion and assumed that Frost was capable of only part-time employment.  Admin. Rec. at 117.  Nevertheless, even performing sedentary work on only a part-time basis, Frost is capable of earning sufficient income to render her ineligible for total disability benefits under the Plan.

III. <u>Frost's Eligibility for Partial Disability Benefits</u>.

Finally, Frost suggests that she is, at a minimum, "partially disabled" under the Plan and, therefore, eligible for at least reduced benefits.  Specifically, she says:

> In this case, the final determination was that "Ms. Frost is medically capable of performing sedentary and light work at least on a part-time basis" . . . . and that "because Ms. Frost is medically capable of part-time sedentary and light work and vocationally employable within her work restrictions, she is not disabled and the decision to terminate her LTD benefit payments is correct under the terms of the policy." (AR 117).

> The policy definitions, however, state that "Disabled means either Totally or Partially Disabled."  (AR 962). Benefits are payable even if the claimant is actually working but making less money.  It would only be logical that the Plaintiff, who is not working, and who has no more than a four hour (half-time) sedentary (not

those, 18 were rated as "excellent" matches, given Frost's abilities, education, training, and experience.  An additional 185 occupations were deemed to be "good" matches for Frost, while the remaining 209 were considered "fair" matches.  Admin. Rec. at 520.  <u>See also</u> Admin. Rec. at 46.

> light) work capacity with additional non-exertional
> limitations according to Dr. O'Dea, the Defendant's own
> IME physician, that LTD would still be payable.

Plaintiff's memorandum at 9.  She does not go on to develop that
argument in any greater detail.

Frost's suggestion that she is eligible for long-term
disability payments under the Plan's definition of "partial
disability" suffers from at least two flaws.  First, she did not
raise that argument in her appeal of Hartford's decision to
terminate her benefits and, therefore, Hartford never had the
opportunity to consider it.  See generally 29 U.S.C. § 1133.  See
also Medina v. Metro. Life Ins. Co., 588 F.3d 41, 47 (1st Cir.
2009) ("A plaintiff who wishes to raise an ERISA claim in federal
court must first exhaust all administrative remedies that the
fiduciary provides.").

Second, Frost does not appear to meet (nor does she claim
that she meets) the eligibility requirements of partial
disability under the Plan.  See Admin. Rec. at 957 (providing,
among other things, that, to be eligible, the employee must be
"performing at least one of the material duties of [his or her]
own occupation on either a full-time or part-time basis.").  Her
claimed entitlement to partial long-term disability payments is
based simply upon her suggestion that it would be "logical,"

plaintiff's memorandum at 9, <u>not</u> that she actually meets the specific requirements of "partial disability" under the Plan.

### Conclusion

For the foregoing reasons, as well as those set forth in Hartford's memorandum, Hartford's motion for judgment on the administrative record (document no. 16) is granted.  Frost's motion (document no. 15) is denied.

The Clerk of Court shall enter judgment in accordance with this order and close the case.

**SO ORDERED.**

Steven J. McAuliffe
Chief Judge

January 28, 2010

cc:  Janine Gawryl, Esq.
     Byrne J. Decker, Esq.